## Louise R. Eure

### v.

## Jefferson National Bank

Record No. 931353

September 16, 1994

Present: Carrico, C.J., Compton, Stephenson, Lacy, Hassell, and Keenan, JJ., and Poff, Senior Justice

*Thomas F. McPhaul (Robert C. Nusbaum; John M. McGowan; Hofheimer, Nusbaum, McPhaul & Samuels*, on briefs), for appellant.

*Gregory S. Larsen (Roy, Laine, Larsen, Romm & Lascara*, on brief), for appellee.

CHIEF JUSTICE CARRICO delivered the opinion of the Court.

This case involves the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 through 1691f (1988 & Supp. IV 1992) (ECOA or the Act). In pertinent part, the Act provides that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of . . . marital status." 15 U.S.C. § 1691(a)(1). Any creditor who fails to comply with the requirements of the Act shall be liable to an aggrieved applicant for actual damages, 15 U.S.C. § 1691e(a), and for punitive damages not to exceed $10,000, 15 U.S.C. § 1691e(b).

Pursuant to § 1691b(a)(1), the Federal Reserve Board has prescribed regulations to carry out the purposes of the Act. One such regulation provides that "a creditor shall not require the signature of an applicant's spouse . . ., other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested." 12 C.F.R. § 202.7(d)(1) (1993).

In the present case, the record shows that on July 17, 1987, Chesapeake Bay Builders, Inc. (Bay Builders) executed a promissory note in the sum of $100,000, payable to the order of Chesapeake Bank and Trust (Chesapeake Bank), the predecessor in interest to the appellee, Jefferson National Bank (Jefferson National). On the same date, Charles H. Eure, Jr., who was a principal in Bay Builders, and his spouse, Louise R. Eure, executed an "Unconditional Guaranty" in which they agreed to guarantee payment of "all liabilities" of Bay Builders to Chesapeake Bank.[1]

Bay Builders defaulted in payment of the note, and Jefferson National made demand upon the guarantors to pay the balance due. When the demand was not met, Jefferson National brought this action against Bay Builders and the guarantors seeking to recover the sum of $72,714.10, plus interest, attorney's fees, and costs.[2]

In her responsive pleadings, Louise R. Eure asserted the defense that she was required to sign the guaranty "solely on the basis of her marital status as the wife of Charles H. Eure, Jr.," that the transaction violated the Act, and, therefore, that the guaranty was void as applied to her. In a pretrial hearing, the trial court struck Mrs. Eure's defense and later entered judgment against her for the balance due on the promissory note executed by Bay Builders.

We awarded Mrs. Eure an appeal limited to the question whether the trial court erred in ruling that the Act does not provide a defense to a person whose signature has been required on a credit instrument solely because of his or her status as a spouse of

---

[1] Similar guaranties were executed by other principals in Bay Builders and their spouses, namely, Arnold Abrons and Annette A. Abrons, William M. Verebely, Jr., and Claudia B. Verebely, John H. Martin and Virginia B. Martin, and David E. Blevins and Nancy B. Blevins.

[2] At the time the action was brought, Charles H. Eure, Jr., was deceased, and his estate was named a party defendant to the action.

an applicant for credit. Finding that the court erred in its ruling, we will reverse.

At the outset of our discussion, we note that Mrs. Eure had no interest in Bay Builders, that she was not a joint applicant for credit, and that Chesapeake Bank made no inquiry concerning Mrs. Eure's credit standing. Further, Jefferson National does not question Mr. Eure's creditworthiness; indeed, a financial statement submitted to Chesapeake Bank at the time it extended credit to Bay Builders showed that Mr. Eure earned more than $200,000 per year as president of Norfolk Shipbuilding and Drydock Corp. and that he had a net worth in excess of $2 million.

Nor can it seriously be questioned that Mrs. Eure's signature was required on the guaranty. While Chesapeake Bank's loan officer testified that "there was no banking regulation, rule or policy which required" Mrs. Eure's signature, he admitted it was "a fairly common practice" to "ask the wife [of a stockholder in a closely held corporation, such as Bay Builders,] to sign on board a guaranty." Furthermore, one of the "terms and conditions" upon which Chesapeake Bank committed itself to make the $100,000 loan in question was that Mrs. Eure would be a guarantor, along with her spouse, of the promissory note covering the loan.

This reduces Jefferson National's argument to the proposition that the Act may not be used defensively to avoid liability on a credit instrument.[3] Jefferson National maintains that the Act specifically provides only for the recovery of damages, which may be sought by way of counterclaim, and that, had Congress intended to provide additional relief in the form of a defense, "it would have included such a provision" in the Act.

Jefferson National opines that Congress's intent to not provide a defense in the Act is evident from a comparison of its provisions with those of the Truth in Lending Act, 15 U.S.C. §§ 1601 through 1667e (1988 & Supp. IV 1992). Jefferson National points out that, originally, the Truth in Lending Act contained no provi-

---

[3] Jefferson National does argue that any right Mrs. Eure may have had to rely on the ECOA violation either for the recovery of damages or for defensive use was barred by the two-year statute of limitations contained in the Act. 15 U.S.C. § 1691e(f) (1988). Mrs. Eure concedes that had she sought to recover damages for the ECOA violation, rather than to assert it as a defense, her claim would have been barred. But she says the two-year statute does not bar defensive use of the violation, and we agree. *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 72 (1956) (using statute of limitations to cut off defense is contrary to statute's purpose of keeping stale litigation out of the courts).

sion allowing it to serve as a defense; later, however, it was amended to provide that it did not bar a consumer from "asserting a violation [of its provisions] as an original action, or as a defense or counterclaim to an action to collect amounts owed by the consumer." 15 U.S.C. § 1640(h). The legislation under consideration here has not been similarly amended, Jefferson National says, and, hence, ECOA "simply does not contemplate the extraordinary relief of debt avoidance."

On the other hand, Mrs. Eure argues that she does not seek "[i]nvalidation of the debt" covered by the promissory note but only to have the guaranty she executed declared unenforceable as to her. She concedes the correctness of decisions cited by Jefferson National wherein use of the Act as a defensive measure was denied. *See, e.g., Riggs Nat'l Bank v. Linch*, 829 F. Supp 163 (E.D. Va. 1993); *CMF Virginia Land, L.P. v. Brinson*, 806 F. Supp. 90 (E.D. Va. 1992). However, she distinguishes those decisions on the ground that, in each instance, both the borrower and the borrower's spouse sought to invalidate a credit instrument on the basis of a violation of the Act. To permit use of the Act as a defense in such circumstances, Mrs. Eure says, "would allow the primary debtor to escape liability on a debt instrument executed independently of any ECOA violation."

Here, Mrs. Eure maintains, she was not a primary debtor on the loan made by Chesapeake Bank; she merely guaranteed a loan made to her spouse's corporation, a transaction from which she derived no benefit. She says that "[a]llowing only her to escape liability on an instrument executed solely as a result of an ECOA violation would further the goals of ECOA to deter discrimination in credit transactions while reinforcing the necessary expectations that primary debtors, debtors who have received the benefits of the loan, will remain liable for repayment of the debt."

■ Continuing, Mrs. Eure asserts that Jefferson National is incorrect in saying that Congress intended the provision for the award of actual and punitive damages to be the exclusive remedy for ECOA violations. Mrs. Eure points out that Congress "did more" than provide a remedy by way of damages; it granted both state and federal courts broad equitable jurisdiction in enforcing the Act. In 15 U.S.C. § 1691e(c), "the appropriate United States district court or any other court of competent jurisdiction" is given the authority to "grant such equitable and declaratory relief as is necessary to enforce the requirements imposed under

[ECOA]." And this grant of equitable jurisdiction, Mrs. Eure maintains, distinguishes ECOA from the Truth in Lending Act, which contains no similar grant.

■ Furthermore, Mrs. Eure argues, "[i]t is a fundamental principle of contract law that contracts executed in violation of law cannot be enforced." The guaranty agreement she signed, Mrs. Eure maintains, is "a contract growing out of an illegal act and a contract contrary to public policy" under both ECOA and a similar Virginia statute.[4] She says that both federal and Virginia decisions provide "the authority to set aside the obligations of an instrument executed in violation of ECOA." Hence, she concludes, a decision by this Court "not to enforce a Guaranty Agreement procured in violation of ECOA will be supported by clear precedent."

■ We agree that "clear precedent" will support such a decision. Indeed, the clearest federal precedent on the subject is found in a decision of the Supreme Court of the United States. *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982), is directly on point on the question whether the specific remedies provided for the violation of an act of Congress must be deemed exclusive or whether the violation may also be used defensively to avoid the obligation of a contract.

*Mullins* involved a contract requiring the steel company to make contributions to employee health and retirement funds based on the hours worked by the company's miners and on the coal it produced and purchased from others. The company made the contributions based on the hours its miners worked and on the coal it produced. However, the company failed to report the coal it purchased from others and to make contributions based on the purchased coal. The company defended its failure on the ground that the requirement to make contributions based on purchased coal was void and unenforceable as violative of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and section 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e).

The Court noted that "[s]ections 1 and 2 of the Sherman Act prohibit contracts, combinations, and conspiracies in restraint of trade, as well as monopolization and attempts to monopolize." 455 U.S. at 78. The Court also noted that "[s]ection 8(e) of the

---

[4] Va. Code §§ 59.1-21.19 through 59.1-21.28 comprise Virginia's Equal Credit Opportunity Act. The provisions of the Virginia act generally parallel those of the federal act.

NLRA forbids contracts between a union and an employer whereby the employer agrees to cease doing business with or to cease handling the products of another employer." *Id.*

The respondent espoused two propositions which, he said, were established by the Court's earlier opinion in *Kelly v. Kosuga*, 358 U.S. 516 (1959), first, "that when a contract is wholly performed on one side, the defense of illegality to enforcing performance on the other side will not be entertained," and, second, "that the express remedies provided by the Sherman Act are not to be added to by including the avoidance of contracts as a sanction." *Mullins*, 455 U.S. at 81. In response, the Court stated it was apparent from the opinion in *Kosuga* that "both propositions were subject to the limitation that the illegality defense should be entertained in those circumstances where its rejection would be to enforce conduct that the antitrust laws forbid." *Mullins*, 455 U.S. at 81-82.

▮▮▮ .The Court held that while "employer contributions to union welfare funds may be quite legal more often than not, . . . an agreement linking contributions to purchased coal, if illegal, is subject to the defense of illegality." *Id.* at 82. And the Court allowed the defense notwithstanding the fact that both the Sherman Act and the NLRA provided specific remedies for their violation. Criminal penalties as well as civil relief by way of treble damages and injunction are provided for violations of the Sherman Act's provisions. 15 U.S.C. §§ 1, 2, 15, and 26. For violations of the NLRA, the National Labor Relations Board is empowered "to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce." 29 U.S.C. § 160(a). Neither act contains any provision permitting defensive use of a violation to avoid liability under a contract. In allowing such defensive use in *Mullins*, the Court stated:

> Refusing to enforce a promise that is illegal under the antitrust or labor laws is not providing an additional remedy contrary to the will of Congress. A defendant proffering the defense seeks only to be relieved of an illegal obligation and does not ask any affirmative remedy based on the antitrust or labor laws. "[A]ny one sued upon a contract may set up as a defence that it is a violation of [an] act of Congress, and if found to be so, that fact will constitute a good defence to the action."

*Id.* at 81 n.7 (quoting *Bement v. National Harrow Co.*, 186 U.S. 70, 88 (1902)).

■ These views apply with equal force here. To deny Mrs. Eure the right to use the ECOA violation defensively would be to enforce conduct that is forbidden by the Act. Such use, therefore, would not be contrary to the will of Congress or in any manner inconsistent with or derogatory of the remedies specifically provided by the Act. Indeed, to permit such use would give effect to the clear legislative intent to deter discrimination in the particular area of endeavor regulated by ECOA.

Virginia law is in accord. In *Blick v. Marks, Stokes and Harrison*, 234 Va. 60, 360 S.E.2d 345 (1987), we stated that "[g]enerally, a contract based on an act forbidden by a statute is void and no action will lie to enforce the contract." *Id.* at 64, 360 S.E.2d at 348. While *Blick* was decided under an exception to the general rule, applicable if it is manifest the General Assembly did not intend to render contracts made in contravention of the statute void, *id.*, we cautioned that the line of cases applying the exception should be "compared, not confused, with . . . a different set of decisions," *id.* at 66, 360 S.E.2d at 349. These "different" decisions, we said, stand for the proposition that a contract made in violation of a statute enacted to protect the public against fraud or imposition or to safeguard the public health or morals " 'is illegal and unenforceable by the guilty party.' " *Id.* (quoting *Lasting Products Co. v. Genovese*, 197 Va. 1, 8, 87 S.E.2d 811, 816 (1955)).

Listed as an example of the "different" decisions was *Bowen Electric Co. v. Foley*, 194 Va. 92, 72 S.E.2d 388 (1952), where we held that the plaintiff-appellant's failure to register as a contractor as required by statute barred its recovery of the balance due on a contract for the erection of an outdoor theater. Also listed was *Colbert v. Ashland Construction Co.*, 176 Va. 500, 11 S.E.2d 612 (1940), where we held that the plaintiff-appellant's failure to register under the fictitious name statute barred his recovery of the balance due on a construction contract.

■ We think that ECOA, like the statutes involved in *Foley* and *Colbert*, is a statute enacted to protect the public against fraud or imposition or to safeguard the public health or morals. In both *Foley* and *Colbert*, we allowed defensive use of a statutory violation to avoid liability under a contract. We hold that Mrs. Eure was entitled to make similar use of the ECOA violation in-

volved in this case to avoid liability, *but only her liability*, under the guaranty agreement she executed in favor of Chesapeake Bank.

Accordingly, we will reverse the judgment of the trial court and enter final judgment here in favor of Mrs. Eure.

*Reversed and final judgment.*